Filed 11/3/25  P. v. Lopez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082910 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE394555) |
| CHRISTIAN GOMEZ LOPEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Patricia K. Cookson, Judge.  Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

One afternoon in May 2016, a group of teenagers were hanging out in front of an apartment complex in Spring Valley. Christian Gomez Lopez, a known gang member, and another man drove up to the group. Lopez got out of the car and confronted the teens about their gang membership. Moments later, Lopez attacked one of the teenagers, 17-year-old Jeffrey Quirino, with a knife, slicing his neck and killing him. Lopez and the other man fled the scene, and the crime went unsolved for several years.

In 2019, Lopez was in custody for an unrelated crime. The detective investigating the unsolved killing organized a *Perkins* operation using a confidential informant and undercover police officer to attempt to obtain information about Lopez's role in the homicide.[1] The operation was successful and, during conversations with the confidential informant, Lopez confessed to killing Quirino. Lopez was charged with and convicted of second degree murder. Lopez also pleaded guilty to charges of assault with a deadly weapon and making and possessing weapons in a penal institution. The trial court sentenced Lopez to an indeterminate prison term of 15 years to life plus one year, plus a determinate prison term of 15 years and 8 months.

On appeal from the judgment of conviction, Lopez makes several arguments. He asserts the trial court erred by denying his request to suppress statements he made during the *Perkins* operation. Lopez also argues the court abused its discretion by denying his motion for the disclosure of the personnel records of two San Diego County Sheriff's deputies involved in his case. Lopez additionally asks this court to conduct an independent review of two in camera proceedings held by the trial court to determine whether to allow the disclosure of the identity of the confidential informant and undercover police officer involved in the *Perkins* operation,

---

[1] *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).

2

and a third confidential informant who identified the man driving Lopez at the time of the murder. Finally, Lopez argues the trial court abused its discretion by imposing the mid-term sentence on the assault with a deadly weapon conviction and by failing to strike a prior strike conviction and a serious prior felony enhancement.

As we shall explain, we reject Lopez's appellate contentions. We have also conducted an independent review of the in camera proceedings and conclude the court properly rejected Lopez's request for disclosure of the identities of the confidential informants and undercover agent. Accordingly, the judgment of conviction is affirmed.

## BACKGROUND

A. *Factual Background*

On the afternoon of May 23, 2016, 17-year old Quirino was hanging out after school with four friends ranging in age from 15 to 17 years old. The five teenagers were in front of an apartment complex on the corner of Delrose Avenue and Elkelton Boulevard in Spring Valley. Quirino and his friends hung out there regularly after school. Quirino's friends testified at trial that neither they nor Quirino were gang members.[2]

Quirino was sitting in his Camaro, which was parked in front of the complex, and his friends were standing around the car. A gray SUV drove up and stopped near the group of teenagers. A man, later identified as Lopez, got out of the passenger side of the SUV, walked toward the group, and asked them where they were from. Some of Quirino's friends responded that they

---

[2] The trial court read three stipulations to the jury concerning the group's criminal history: Quirino had a true finding in a juvenile matter in 2015 for felony resisting arrest, a companion had a true finding in 2015 for throwing a substance at a vehicle, and another companion had a true finding in 2010 for felony battery.

3

did not "bang." Quirino stood up, walked toward Lopez, and said something like "we don't bang but my brother's from Lomita." Lopez responded, "Fuck Lomita" and stabbed Quirino in the neck with a knife.

The cut severed Quirino's carotid artery, and blood began spurting from his neck. About the same time, the driver of the gray SUV got out and came around the vehicle, towards Lopez. The two men then ran back to the SUV and drove away. Neighbors called 911.

Meanwhile, Christopher E. was driving his sedan on Elkelton Boulevard. His girlfriend, Jasmin Z., and her sister, Crystal R., were in the car. They saw a commotion as they neared the apartment complex. When Christopher stopped at the stop sign at the corner of Delrose and Elkelton, Crystal saw two people enter a parked gray SUV and drive off. Moments later, she observed a group of people on Delrose standing around a man who was leaning against a car and bleeding from his neck.

Crystal asked the group if they needed help. Someone helped Quirino into the back seat of the sedan, and he collapsed onto Crystal, who was sitting in the back passenger seat. Blood was gushing out of a large wound on the left side of Quirino's neck. Crystal took off her shirt, wadded it up, and applied it to the wound. Christopher sped toward the hospital. Quirino lost consciousness on the way, and his breathing became shallower. When they arrived at the hospital, Quirino was taken in on a gurney and Crystal, Jasmin and Christopher waited outside to speak with police.

By this time, several San Diego County Sheriff's deputies arrived at the apartment complex and began speaking with Quirino's friends and other witnesses. Based on evidence the witnesses provided, the deputies alerted law enforcement to be on lookout for the suspects.

4

Quirino died from the stab wound to his neck, which was two- to two-and-a-half inches deep. The knife severed his carotid artery and cut his jugular vein.

Two days after the stabbing, Crystal provided law enforcement with a description of the gray SUV and its occupants. She also helped create a composite sketch of the driver, which law enforcement included in a bulletin issued to the public.

In July 2016, officers located a Hyundai Santa Fe that matched images of the SUV captured on surveillance cameras near the stabbing. The Sante Fe was registered to Juan Carlos Arguelles. Officers impounded the vehicle and processed it for fingerprints. Arguelles resembled the composite sketch of the driver Crystal helped prepare and his social media posts suggested he was a member of the Logan Heights Gang. Sheriff's deputies interviewed Arguelles but released him later that day. In 2017, investigators determined three fingerprints lifted from the Santa Fe's front passenger window matched Lopez's fingerprints. Then the investigation stalled.

In 2019, a new detective, Jacob Wilson, took over the investigation after the former detective retired. Based on his review of the evidence that had been collected, Wilson believed Arguelles was the driver of the SUV during the stabbing. He reviewed Arguelles's social media accounts and phone records from the time of the crime. Wilson found the only person communicating with Arguelles at that time was Lopez, and they were communicating through Facebook. Photographs of Lopez on Facebook showed Lopez had the same physical characteristics as Quirino's killer. Based on witness statements and a surveillance video that showed the stabbing, Wilson believed Quirino's killer, like Lopez, was about six feet tall, and had slicked back hair and possibly a mustache.

Wilson found two additional Facebook accounts that were associated with Lopez but that had not been discovered earlier.  One of the accounts was opened in May 2016, with the name "Crisraww Christian," and was later changed to the name "Sckinny Logan."  There were 30 Facebook messages between Lopez and Arguelles during the week before the stabbing, and more messages about a week after the stabbing.  Arguelles referred to Lopez in the messages as "Sckinny."

In September 2019, Wilson learned that Lopez was in custody on an unrelated crime.[3]  Wilson met with Francisco Brambila, a detective in the criminal investigation unit for the sheriff's department,  which was responsible for jail security and undercover operations within the jail, and other members of the sheriff's department and the district attorney's office.  The law enforcement agents made plans to conduct a *Perkins* operation several days after Lopez was incarcerated.[4]  The operation involved two "operators" who were outfitted with audio recording devices.  A video camera located outside of the jail cell also captured the interaction.

---

[3]    An investigative report prepared by Wilson stated that Lopez was arrested on September 2, 2019, for "theft related charges" and booked into San Diego Central Jail.

[4]    During his testimony, Brambila described a *Perkins* operation.  He explained that a suspect is placed in a holding cell with one or more operators—either undercover law enforcement agents or paid informants—and recording devices are hidden in the cell or on the operators.  During the operation, facts about the case or evidence, "stimulation," are presented to the suspect to get him to discuss the crime.  Brambila stated that paid informants are usually people who had committed crimes and offered their services to the department, and many were former gang members.  The informants Brambila used were not trying to obtain a reduced sentence and instead were paid $1,500 regardless of whether their target confessed.

On the day of the operation, the two operators, one a paid informant (Operator 1) and the other an undercover sheriff's deputy (Operator 2), were placed in a jail holding cell alone. Around 1:20 p.m., while the two men were conversing, Lopez was placed in the cell. He introduced himself in Spanish to Operator 1 as "Skinny from Treinta" and Operator 1 introduced himself as "Toro" from the East side. Operator 2 told Lopez his name was Jason, and Lopez said he was "Skinny from Logan."[5]

At first, the men talked generally about why there were incarcerated. Operator 1 told Lopez he was facing federal charges and was being transported back to Los Angeles, where he was allegedly from. Lopez and Operator 1 also discussed the drug trade in Spanish and English. At one point, Operator 1 told Lopez that he had seen a murder charge against Lopez. Lopez denied having anything to do with a homicide and told Operator 1 the police had the wrong person.

Around 3:00 p.m., Wilson and another detective entered the cell and told Lopez they were investigating a homicide in 2016. The detectives showed Lopez some photos from Quirino's autopsy and a photo of the gray SUV the perpetrators were driving. Wilson also told Lopez his fingerprints were found on the SUV. Lopez denied any knowledge about the murder, and Wilson responded that they were not asking any questions at that point. Wilson and the other detective exited the cell, and left behind the bulletin with the sketch that had been issued shortly after the killing.

After this "stimulation" by police, Operator 1 took on a counseling role with Lopez, informing Lopez about his own experiences in the criminal justice system and telling Lopez he needed to educate himself about the

---

[5]    Operator 2 was removed from the cell about 90 minutes after Lopez entered.

process and his own case. Operator 1 told Lopez he thought the officers had more incriminating evidence than what they showed him. He emphasized the police could obtain his internet activity, that surveillance cameras were prevalent, and that DNA evidence could incriminate him.

During their conversation, Lopez told Operator 1 he was caught, but he also said that the existence of his fingerprints on the car did not prove he was connected to the crime. Operator 1 suggested someone might have "ratted" out Lopez. Operator 1 also told Lopez he needed to get a good lawyer. Lopez asked Operator 1 if he should tell his lawyer the truth. At one point during this exchange, Operator 1 said, "Just with what you've told me, I already know that you did the job, man, but it's not my problem. But you have to use your head, homie," and Lopez responded, "Uh-huh."

Operator 1 advised Lopez a good lawyer would help him, and told Lopez that his lawyer could not reveal their communications to anyone. Lopez asked Operator 1 for the name of his lawyer, and Operator 1 gave a name and told Lopez he could find him on the internet. When Lopez asked Operator 1 how much a good lawyer would cost, Operator 1 told him it could be $50,000 to $60,000. Operator 1 repeated that Lopez should study the law and get knowledgeable to help his lawyer defend him. Lopez and Operator 1 also discussed the bulletin, and Lopez said he would cut his hair so he did not resemble the sketch in the bulletin.

As time passed, Operator 1 and Lopez became friendlier and their conversation flowed naturally in Spanish and English. They discussed the crime, and Lopez admitted to stabbing the victim, but throughout the conversation maintained he acted in self-defense. Lopez said that he thought the victim and his six friends were going to jump him, and that they were "bang[ing]" and probably had guns, so he stabbed the victim before they could

8

hurt him. Lopez told Operator 1 that one of the teenagers was "strapped." Lopez repeated that he had been caught, but continually told Operator 1 the stabbing was in self-defense, and that he believed his own life was on the line. Lopez also repeatedly said his story of self-defense was the truth, and Operator 1 agreed with Lopez that self-defense would help him avoid a long sentence.

Detective Wilson listened to the recording of the *Perkins* operation the following day and arrested Lopez for murder.

B. *Procedural Background*

After his arrest, the San Diego County District Attorney filed a consolidated amended information charging Lopez with murder (count 1; Pen. Code,[6] § 187, subd. (a)), possession of a weapon at a penal institution (count 2; § 4502, subd. (a)), manufacturing a weapon in a penal institution (count 3; § 4502, subd. (b)), and assault with a deadly weapon (count 4; § 245, subd. (a)(1)). The consolidated amended information also alleged a prior strike conviction (§§ 667, subd. (b)–(i), 668, 1170.12) and a serious prior felony enhancement (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)). Before trial, Lopez pleaded guilty to counts 2, 3 and 4. He also admitted the prior strike conviction and the serious prior felony conviction, as well as two aggravating factors.

At the conclusion of trial, the jury found Lopez guilty of second degree murder (count 1; § 187, subd. (a)) and found true an allegation that he used a deadly weapon, a knife, in the commission of the crime in violation of section 12022 subdivision (b)(1). On the same day, Lopez pleaded guilty in a

---

6    Counts 2, 3, and 4 stemmed from an assault committed by Lopez with "a sharp instrument" while he was incarcerated awaiting trial. All further undesignated statutory references are to the Penal Code.

9

separate case (no. SCD 283179) to grand theft (§ 487, subd. (a)) and commercial burglary (§ 459).

Thereafter, the court sentenced Lopez to state prison for an indeterminate term of 15 years to life plus one year, plus a determinate term of 15 years and 8 months. The sentence was comprised of an indeterminate term of 15 years to life for murder (count 1), a consecutive one-year term for the deadly weapon enhancement attached to count 1, a consecutive two-year term for possession of a weapon at a penal institution (count 2), a consecutive three-year term for assault with a deadly weapon (count 4) doubled to six years because of the strike, a consecutive 16-month term for grand theft (case no. SCD283179), a consecutive 16-month term for burglary (case no. SCD283179), and a consecutive five-year term for the serious prior felony enhancement.

Lopez timely appealed from the judgment of conviction.

DISCUSSION

I

*Perkins Operation*

Lopez first contends that the trial court erred by denying his motion to exclude statements he made during the *Perkins* operation. He argues that his rights against self-incrimination under the Fifth and Fourteenth Amendment to the U.S. Constitution were violated by the operation, which was equivalent to a custodial interrogation that occurred without an advisement of rights. The Attorney General responds the trial court properly denied the motion to exclude the statements because the statements were voluntary and made without improper coercion.

A

*Additional Background*

As discussed, almost three years after the murder, law enforcement conducted the *Perkins* operation while Lopez was in custody on unrelated charges. The operation lasted over four and a half hours. The video recording of the operation with matched audio from the recording devices was played for the jury. During the operation, Lopez made several incriminating statements to Operator 1 admitting he stabbed Quirino in the neck.

Before trial, Lopez moved to exclude the statements on the ground that they were coerced by law enforcement during an interrogation in which *Miranda* warnings were required and that his statements were not voluntary.[7] The prosecutor opposed the motion, arguing no *Miranda* advisement was required because the statements were made during a non-police custodial interrogation, and they were not obtained by any coercive method.

---

[7]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

11

At the hearing on the motion, defense counsel argued Lopez's statements should be excluded because his right against self-incrimination was violated during the *Perkins* operation; the facts of his case were distinguishable from the facts in *Perkins*; and, in this case, law enforcement used the *Perkins* operation "specifically to circumvent" *Miranda*. Defense counsel pointed to the questioning that occurred in *Perkins*, which she described as pointed questions to the suspect by the undercover officer. In contrast, she argued the operators in Lopez's case engaged in "manipulation techniques" to circumvent Lopez's Fifth Amendment rights, which caused him to involuntarily incriminate himself.

The prosecutor responded by referring the court to the arguments in his opposition brief, and also asserting Lopez was in a less coercive situation than the one approved in *Perkins*. He argued that unlike the pointed questions posed to the suspect in *Perkins*, here, the operator gave Lopez a "forum to speak" and neither Operator 1 nor Wilson lied to Lopez. Instead, Wilson gave truthful information about the evidence the police had, which spurred Lopez and Operator 1 to talk about the crime, and Lopez to freely admit his involvement.

At the conclusion of the hearing, the court denied the motion, stating it did not "see any police coercion" or "intimidation." The court also found Lopez was not interrogated, and that the recording of the operation showed a conversation between two cellmates.

B

*Legal Standards*

As Lopez himself states, it is settled that conversations between suspects and undercover agents may be admissible without police offering the admonitions attendant to custodial interrogations under *Miranda*. (*Perkins*,

12

*supra*, 496 U.S. at p. 296; *id*. at p. 298 ["*Miranda* was not meant to protect suspects from boasting about their criminal activities in front of people whom they believe to be their cellmates."].) "The warning mandated by *Miranda* was meant to preserve the privilege during 'incommunicado interrogation of individuals in a police-dominated atmosphere.' *Id*., at 445. That atmosphere is said to generate 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' *Id*., at 467. 'Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated.' " (*Perkins, supra*, 496 U.S. at p. 296.)

The due process clauses of the Fourteenth Amendment to the federal Constitution as well as article I, section 15, of the California Constitution bar the prosecution from using a defendant's involuntary statements. (*People v. Boyette* (2002) 29 Cal.4th 381, 411; *People v. Weaver* (2001) 26 Cal.4th 876, 920; *People v. Benson* (1990) 52 Cal.3d 754, 778 (*Benson*).) " 'A statement is involuntary if it is not the product of " 'a rational intellect and free will.' " [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 346–347.) " 'A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary.' " (*Id*. at p. 347.) " 'Although coercive police activity is a necessary predicate to establish an involuntary confession, it "does not itself compel a finding that a resulting confession is involuntary." [Citation.] The statement and the inducement must be causally linked.' " (*Ibid*.) "Police trickery" therefore, "does not, by itself, render a confession involuntary." (*People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280.)

13

"[T]he ultimate issue of the voluntariness of a confession is reviewed independently in light of the record in its entirety." (*Benson, supra*, 52 Cal.3d at p. 779.) When a defendant alleges that "coercive, deceptive, and overreaching tactics" were used by agents during a *Perkins* operation to "elicit defendant's incriminating statements," we focus on whether those tactics were " 'the type likely to procure an untrue statement.' " (*People v. Fayed* (2020) 9 Cal.5th 147, 165 (*Fayed*).) Because Lopez's interactions with the operatives were recorded, the facts are undisputed. Thus, we independently review their meaning and significance. (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

## C

### *Analysis*

Lopez asserts he was faced with coercive police activity because he was confronted with evidence concerning the homicide and Operator 1 directly suggested the evidence tied him to the crime. He asserts his incriminating statements, which were all made after Wilson showed him evidence, "were the product of Wilson's coercive influence and [Wilson's] looming return." Lopez also argues he was subject to greater coercion than the suspect in *Perkins* because he initially denied participating in the murder, even "after Wilson confronted him with evidence connecting him to the crime." Further, he argues that because the transcript has many "unintelligible portions," his statements lack context and it is unclear whether the statements "resulted from suggestions or comments of the undercover operators."

We disagree with Lopez's interpretation of the operation. Lopez initiated the conversation with the operatives. Contrary to Lopez's assertion on appeal, after Wilson showed Lopez the evidence, Lopez suggested that he acted in self-defense, not Operator 1. Thereafter, Lopez asked Operator 1 for

14

advice about how to proceed and for an attorney referral. He treated Operator 1 as a sounding board to develop a strategy to escape a murder charge. In doing so, Lopez participated in a voluntary discussion, and was not subjected to a pressure campaign designed to overcome his will.[8] (See *Fayed, supra*, 9 Cal.5th at p. 166 ["If the ' "decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." ' "].)

Further, Lopez's conduct belies his coercion claim because it was apparent that he did not feel any compulsion or pressure to speak with Operator 1. (*Perkins, supra*, 496 U.S. at p. 296 ["Coercion is determined from the perspective of the suspect."].) For example, Lopez denied any involvement in the homicide when Wilson was present. Thereafter, throughout the hours they were in the cell together, Lopez repeatedly asked Operator 1 to affirm his belief that he had acted in self-defense. Further, Lopez told Operator 1 about his relationship with his girlfriend and professed to be done with the gang lifestyle. In addition, as the Attorney General points out, the *Perkins* operation occurred three years after the homicide, also lessening any pressure Lopez might have felt.

We also reject Lopez's claim that Wilson's conduct created a coercive environment. When he entered the cell, Wilson provided Lopez with undoctored evidence. Nothing Wilson said or provided to Lopez was false. Wilson simply gave Lopez the facts at hand and told Lopez he would later be questioned about the evidence. Wilson was careful not to question Lopez at that time. While Lopez was undoubtedly stressed by the realization that law enforcement had identified him as Quirino's killer, the true facts Wilson

---

8     Indeed, Lopez continued talking to Operator 1 even after pointing out that there was a camera facing their cell.

showed Lopez were not unduly coercive. (Cf. *Fayed, supra*, 9 Cal.5th at p. 165 [Even " '[t]he use of deceptive statements during an investigation does not invalidate a confession as involuntary unless the deception is the type likely to procure an untrue statement.' "].)

Finally, Lopez's contention that the transcript is too unintelligible to provide an accurate representation of the operation is not supported by the record. Lopez asserts the written transcript contains approximately 475 " 'unintelligible' portions." The unintelligible portions, however, are at most a word or two each. A review of the recordings makes clear the context of the conversation is not obscured, and the actual recording contains only a handful of inaudible words. Lopez's contention on this point has no merit.

Contrary to Lopez's argument, there is no indication in the video and audio recording of the operation that anyone pressured Lopez to share the details of his involvement in the murder. In short, nothing in this record suggests the agents did anything to coerce Lopez to confess and his incriminating statements during the operation were properly admitted into evidence at trial.[9]

---

[9]     Our conclusion that Lopez's incriminating statements were not coerced obviates the need to reach the parties' arguments concerning prejudice.

*Pitchess Motion*

Lopez next contends the trial court erred by denying his motion under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*) without holding an in camera hearing to review the personnel records of Wilson and Brambila. He asserts that contrary to the trial court's finding, his motion set forth good cause for the discovery. The Attorney General responds that Lopez did not establish good cause for the information and, thus, the denial was not error.

A

*Additional Background*

Two months before trial, Lopez filed a motion for discovery of the personnel records of Wilson and Brambila pursuant to *Pitchess*. Therein, Lopez sought "[a]ny evidence of … false statements in the police reports; and … complaints of dishonesty" by Wilson and Brambila. The motion alleged that Wilson and Brambila failed to disclose information concerning a video recording of the *Perkins* operation that was captured by the camera outside the cell, which demonstrated the deputies' "willingness to provide false testimony under oath" and "in the police reports."

In the motion, Lopez's counsel asserted that "[t]he Prosecution had previously requested any [and] all recordings [of the *Perkins* operation] and had been informed there was no video recording of the *Perkins* Operation." However, on January 13, 2023, "the Prosecution informed the court and defense counsel that [the] day prior he learned from a law enforcement official that there indeed was a video recording of the *Perkins* operation held on September 7, 201[9], in the cell facing the cell Mr. Lopez and the *Perkins* operator were in." Defense counsel claimed that this "new information" contradicted Wilson's testimony at the preliminary hearing "where he

testified that there was not a video recording of the *Perkins* operation." Counsel also alleged Brambila wrote in his police report that "the video recording facing the cell was turned off at 6:23 p.m. without any more explanation to inform that the video had recorded the *Perkins* operation."

Lopez's counsel claimed the requested discovery was material to the case because Lopez's "defense is partly based upon police misconduct, including, but not limited to: (1) false statements in police reports; and (2) any other evidence of or complaints of dishonesty." Counsel argued the "requested information could potentially lead to the discovery of admissible evidence, critical to challenging the officer's credibility and exposing his/her bias and/or motivation for engaging in the improper conduct alleged … herein." In a declaration attached to the motion, Lopez's counsel repeated the information she alleged in the motion and claimed "good cause has been established for an in-chambers review of" the officers' personnel records.

The San Diego County Sheriff's Department filed an opposition to the motion asserting Lopez had not established good cause for the records. The attorney for the sheriff's department explained that Wilson's testimony at the preliminary hearing was true because there was no video camera *in* the cell where the *Perkins* operation took place. The opposition asserted Wilson gave no indication at the preliminary hearing that he was aware of a video camera outside of the cell. Further, Wilson testified he was not involved in setting up the cell for the operation. Rather, the Detention Investigations Unit set up the cell, so Wilson did not have personal knowledge of the camera. The attorney argued "Wilson did not intentionally mislead the parties or the court. Counsel's assertion in the Declaration is simply incorrect."

With regard to Brambila, the attorney for the sheriff's department stated Brambila's police report had not been provided by Lopez's counsel, so

18

there was no context for the court to evaluate the truth or falsity of the allegation. Further, the alleged statement from Brambila's police report bore "no hallmarks of falsity" and showed only "the time that a video recording was turned off." That statement did not show "an attempt by Detective Brambila to conceal the fact that a camera was recording in a different cell."

At the hearing on the *Pitchess* motion, Lopez's counsel argued the detectives lied to the prosecutor when they told him previously that no video of the *Perkins* operation existed. Further, counsel asserted Wilson also lied at the preliminary hearing when he was asked if there was a video and he answered "no." Counsel argued the "falsity in this case" was relevant to the officers' credibility. In response, the attorney for the sheriff's department conceded "there was an error that occurred," because "there was a video that the sheriff's deputies didn't know about," but "[a]s soon as the error was discovered," the video "was revealed." Thus, the attorney argued, "nobody lied."

At the conclusion of the argument, the trial court denied the motion, finding Lopez had not established good cause. The court explained, "this all boils down to the absence of information concerning a video recording of the *Perkins* operation. … The defendant claims that the testimony in the police reports [was] deliberately falsified and as a result … the officers' false testimony reports affect their credibility as witnesses." The court found Wilson did not lie at the preliminary hearing or "create any misrepresentation." Rather, Wilson was not aware "at the time that the camera in question was in a different cell and partially captured the event." The court also found there was no evidence Brambila had made a false statement. The court concluded, "It is a common-sense determination that the court is required to make. And I just do not see in [defense counsel's]

19

declaration that there is any … specific allegations of untruthfulness or lies. It is a question of just not having any knowledge."

B

*Legal Standards*

The Supreme Court's decision in *Pitchess* established that a criminal defendant may " 'compel discovery' of certain relevant information in the personnel files of police officers by making 'general allegations which establish some cause for discovery' of that information and by showing how it would support a defense to the charge against him." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1018–1019 (*Warrick*).) The Legislature later codified *Pitchess* in sections 832.7 and 832.8, and Evidence Code sections 1043 through 1045. (*Warrick*, at p. 1019.) In short, the *Pitchess* statutory "scheme entitles a defendant to information that will 'facilitate the ascertainment of the facts' at trial [citation], that is, 'all information pertinent to the defense.' " (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 14.)

*Pitchess* discovery under the statutory scheme proceeds in a two-step process. Under the first step, the defendant must file a written motion describing the type of records or information sought, supported by an affidavit showing "good cause" for the discovery or disclosure, setting forth the materiality of the discovery or disclosure to the "subject matter involved in the pending litigation," and stating upon reasonable belief that the government agency at issue has the records or information requested. (Evid. Code, § 1043, subds. (a) & (b); *People v. Mooc* (2001) 26 Cal.4th 1216, 1226 (*Mooc*).) Then, if the trial court finds good cause for the discovery, it conducts an in camera review of the pertinent documents to determine which, if any, are relevant. (Evid. Code, § 1045, subd. (b).) " 'Subject to statutory

20

exceptions and limitations … the trial court should then disclose to the defendant "such information [that] is relevant to the subject matter involved in the pending litigation." ' " (*Haggerty v. Superior Court* (2004) 117 Cal.App.4th 1079, 1086.)

At the first stage, a defendant need satisfy only a "relatively low" threshold to establish good cause. (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 83.) Nevertheless, a defendant is not entitled to an in camera review of peace officer personnel records without " 'establish[ing] a plausible factual foundation' " for the allegation of officer misconduct. (*Warrick, supra*, 35 Cal.4th at p. 1025.) The defendant "must present … a specific factual scenario of officer misconduct that is plausible when read in light of the pertinent documents." (*Ibid.*) Corroborating collateral evidence is not required, nor is a defendant required to "present a *credible or believable* factual account of, or a motive for, police misconduct." (*Id.* at p. 1026.) Instead, all that is required is a showing that the alleged scenario "might or could have occurred." (*Ibid.*) "[D]epending on the circumstances of the case," a sufficient factual allegation in a *Pitchess* motion "may consist of a denial of the facts asserted in the police report." (*Id.* at pp. 1024–1025.)

A trial court has wide discretion when ruling on a *Pitchess* motion. (*People v. Memro* (1995) 11 Cal.4th 786, 832.) However, a trial court's exercise of its discretion is not unlimited and must be governed by the controlling legal principles. (See *People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977.)

C

*Analysis*

We agree with the Attorney General that Lopez failed to establish the good cause necessary to support an in camera review of the officers' personnel

21

records. As the Attorney General points out, there was no evidence that either detective made false statements or intentionally withheld information about the existence of a video recording before it was discovered and disclosed. The only evidence provided by Lopez about Wilson was his testimony at the preliminary hearing that he was not involved in setting up the operation, that he knew there "were audio recorders set up in the room," and that "there were no cameras in th[e] room that we were able to use." The only information provided concerning Brambila was a report he prepared setting out the operation's timeline, which stated that "[a]t approximately 1324 hours, the video recording device [redacted] was turned on" and "[a]t approximately 1823 hours, the video recording device facing the cell was turned off."

This evidence suggests only that Wilson was unaware there was a camera in an adjacent cell that captured the operation and that Brambila did know about the camera and was forthcoming about it in his report. Indeed, there is no indication in the record that Brambila was ever asked whether a video existed. (*Mooc, supra*, 26 Cal.4th at p. 1226 ["The affidavits may be on information and belief and need not be based on personal knowledge [citation], but the information sought must be requested with sufficient specificity to preclude the possibility of a defendant's simply casting about for any helpful information"].)

Further, Lopez has failed to show how the alleged misconduct was material or relevant to his defense. At trial, Lopez's defense was that he stabbed Quirino in self-defense. He made no assertion that any police misconduct by the investigators was at issue. (*California Highway Patrol v. Superior Court* (2000) 84 Cal.App.4th 1010, 1020 ["A showing of 'good cause' requires defendant to demonstrate the relevance of the requested information

22

by providing a 'specific factual scenario' which establishes a 'plausible factual foundation' for the allegations of officer misconduct committed in connection with defendant."].)

Given Lopez's failure to identify any plausible officer misconduct or its relationship to his defense, the trial court did not abuse its discretion by finding that Lopez failed to establish good cause to support an in camera review of the detectives' personnel files.

## III

### *Discovery Motion*

Lopez next asks this court to independently review the transcripts for two confidential hearings conducted by the trial court to address his motion to unseal the names of two confidential informants, Operator 1 and another informant who provided unhelpful information to police during the investigation, and the undercover officer, Operator 2, involved in the *Perkins* operation. The Attorney General does not oppose Lopez's request for an independent review of the transcripts.

## A

### *Additional Background*

On December 19, 2022, Lopez filed a "motion for order to produce discovery regarding confidential informants" seeking "the name and date of birth of the confidential informant [and] the undercover officer" involved in the *Perkins* operation. He asserted the discovery was "necessary for the defense to investigate and determine whether the audio recordings of Mr. Lopez and the two 'Operators' were obtained in violation of Lopez's Due Process and other constitutional rights." Counsel argued Lopez's statements were "not [the] 'product of a free and deliberate choice' but most certainly a direct result of a well-planned and carried out *deception*." Lopez's counsel

argued the confidential informant and the undercover detective "entered the jail holding cell with [Lopez] and immediately talked in a manner designed to signal to Lopez that they were like him, who he could trust (and fear) based upon the bonds of their common gang membership."

The prosecutor filed a response to the motion, noting the informant and the undercover officer were not material witnesses, and requesting an in camera hearing pursuant to section 1054.7 if necessary. The prosecutor argued that because he did not intend to call the undercover agent and confidential informant as witnesses, there was no valid basis to disclose their identities. The prosecutor asserted neither individual had any "exculpatory evidence" or independent knowledge of the crimes or the defendant outside of the *Perkins* operation, which "was recorded and discovered to defense."

The prosecutor also noted Lopez "did not make any admissions in front of the undercover Deputy Sheriff." With regard to the confidential informant, the prosecutor argued the defense "failed to establish that [he] was a 'material witness'" because he "was not a co-participant in the crime nor was he a witness to the crime." Rather, his involvement was comprised solely of sitting in a cell and talking to Lopez. The prosecutor stated "there would be an extreme danger to the [confidential informant]'s life if his identity was revealed," and revealing his identity would compromise the sheriff's department's ability to use the individual for other operations, compromising future investigations.

On March 3, 2023, Lopez filed a "motion for order to produce discovery regarding confidential informant[]." Lopez sought "an order directing the prosecution to produce discovery regarding [the] confidential informant that identified Juan Carlos Arguelles" as the driver and " 'Vamps' [as] the passenger involved in the stabbing charged in this case." Lopez's counsel

asserted the informant appeared to have knowledge of the "precise details of the stabbing." Counsel explained that in January 2019, "San Diego County Sheriff Sergeant Navarro and Deputy Wilson met with a confidential informant (CI) at the George Bailey Detention Facility and discussed the murder charge against Mr. Lopez. The CI told them that the driver of the vehicle of the incident was known as 'Tripps' and his name was Juan Carlos, referring to Juan Carlos Arguelles, from Logan Heights gang, subset '33rd.' The CI further told officers that the passenger involved in the stabbing was 'Vamps' also from Logan Heights gang, subset 'Red Steps.' " Defense counsel asserted this information was exculpatory and thus the informant was a material witness and nondisclosure of his identity would deprive Lopez of a fair trial.

The prosecution opposed the motion, arguing the informant was not a material witness. The prosecution also argued that the informant "provided law enforcement with speculative hearsay information," which was "vetted by law enforcement and proven to be false."

At a hearing on the motion on March 24, 2023, the prosecutor stated that detectives were available for an in camera hearing to testify as to why the individuals' identities should remain privileged. The court then conducted an in camera hearing pursuant to Evidence Code section 1042 subdivision (b) and the proceeding was sealed. Thereafter, the court denied Lopez's request to disclose the names of the confidential informants, but granted the request to disclose the identity of the undercover officer based on the prosecutor's assertion that he did not oppose releasing the name. The prosecutor stated he would provide the officer's name to the defense.

In its ruling, the court explained that "based upon the testimony it heard in camera, the confidential informant's information was hearsay. And

what the court looks at under 1042 is the possibility that the confidential informant would give evidence on the issue of guilt which might result in the defendant's exoneration." The court continued that a "reasonable possibility is predicated upon the relative proximity of the confidential informant to the offense charged." The court concluded Operator 1 was "neither a participant or a nonparticipant eyewitness to the charged offense. Frankly, he wasn't there. He was in the jail with the defendant. [¶] So the court finds that the possibility that the confidential informant could give evidence which might exonerate the defendant is even more speculative." On the request of Lopez's counsel, the court clarified its ruling pertained to both Operator 1 and the other informant that purported to identify the SUV occupants.[10]

On April 12, 2023, the prosecutor filed a motion to revisit disclosure of the identity of the undercover sheriff's deputy that participated in the *Perkins* operation. The prosecutor asserted the undercover officer was not a material witness and was not going to be called by the prosecution at trial, nor could the officer provide exculpatory information since he had no firsthand knowledge of the crime. On May 1, 2023, the court conducted a second in camera hearing to consider the prosecutor's motion, which was sealed. After the hearing, defense counsel argued the officer's identity was relevant "to effectively … confront any statements from the *Perkins* operation that were elicited by a train[ed] professional with specific techniques" to obtain incriminating statements from Lopez. The court then ruled disclosure was not required, finding the deputy was "really not a material witness" and his testimony would not be relevant to the case. The court further found that disclosure would place the officer and his family in "great danger."

10    The court also explained it heard testimony during the in camera hearing from a sergeant, lieutenant, and detective, relating to both of Lopez's discovery motions.

B

*Legal Standards*

As relevant here, Evidence Code section 1041 grants a public entity a privilege to refuse disclosure of the identity of a person who has furnished information in confidence to a law enforcement officer if "[d]isclosure of the identity of the informer is against the public interest because the necessity for preserving the confidentiality of his or her identity outweighs the necessity for disclosure in the interests of justice." (Evid. Code, § 1041, subds. (a)(2) & (b)(1).)

"[T]he prosecution must disclose the name of an informant who is a material witness in a criminal case or suffer dismissal of the charges against the defendant. [Citation.] An informant is a material witness if there appears, from the evidence presented, a reasonable possibility that he or she could give credence on the issue of guilt that might exonerate the defendant. [Citation.] The defendant bears the burden of adducing ' " 'some evidence' " ' on this score. [Citations.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 159 [independent review of in camera hearing indicated trial court applied correct standard in determining informant's identity was privileged].)

When a party demands disclosure of an informant's identity, Evidence Code section 1042 subdivision (d), requires the court to conduct a hearing "at which all parties may present evidence on the issue of disclosure." However, if the identity of the informant could be compromised by such a hearing, "the prosecuting attorney may request that the court hold an in camera hearing. If such a request is made, the court shall hold such a hearing outside the presence of the defendant and his counsel. At the in camera hearing, the prosecution may offer evidence which would tend to disclose or which discloses the identity of the informant to aid the court in its determination

27

whether there is a reasonable possibility that nondisclosure might deprive the defendant of a fair trial." (Evid. Code, § 1042, subd. (d).)

C

*Analysis*

As discussed, Lopez asks this court to independently review the sealed transcript of the in camera hearings to assess the correctness of the trial court's ruling, and the People express no objection. Having done so, we conclude the trial court did not err in denying defense counsel's request to disclose the identity of the confidential informants and the undercover sheriff's deputy because they could not provide information that was exculpatory or material to Lopez's guilt or innocence with respect to the offenses charged in this case and disclosure of their identities would place them in danger. (Evid. Code, § 1041, subd. (b)(2).)

IV

*Sentencing Issues*

Lopez's final contentions on appeal relate to the sentence imposed by the trial court. He asserts that the court abused its discretion by imposing the middle term for count 4, assault with a deadly weapon, by refusing to strike his prior strike conviction, and by failing to strike his serious prior felony enhancement. The Attorney General responds that the court acted within its sentencing discretion, and that Lopez forfeited his arguments concerning the serious prior felony enhancement by failing to raise the issue in the trial court.

A

*Additional Background*

Before sentencing, Lopez admitted two aggravating factors that were alleged in the consolidated amended information: that the offense involved

28

great violence, bodily harm, or threat of great bodily harm (California Rules of Court, rule 4.421(a)(1)), and that his prior convictions as an adult and sustained matters in juvenile delinquency petitions were numerous and of increasing seriousness (*id.*, rule 4.421(b)(2)). Lopez also admitted a prior strike conviction and a serious prior felony conviction.

The prosecutor filed a statement in aggravation and an amended statement in aggravation. Therein, the prosecution requested imposition of the upper term on counts 2 through 4, and asked the court to impose the five-year enhancement for Lopez's serious prior felony on the determinate term for counts 2 through 4. The prosecution requested a total indeterminate term of 16 years to life (count 1), plus a determinate term of 15 years.

Lopez filed a statement in mitigation which attached a "forensic psychological examination" evaluation from clinical and forensic psychologist Dr. Bruce Yanofsky. The statement asserted that the psychological evaluation showed Lopez's life was "plagued by trauma and abuse." Specifically, the statement explained Lopez had been exposed to methamphetamine in utero, observed domestic violence and substance abuse in his home as a child, suffered physical and sexual abuse, and was placed in the foster care system. The defense statement asserted that as a result of this history, Lopez became addicted to drugs, and was using PCP and heroin daily at the time of his arrest in 2019. The statement also asserted Lopez recently renounced his gang involvement and had started mental health treatment. The mitigation statement emphasized that Dr. Yanofsky's report showed Lopez had experienced childhood trauma and had mental health difficulties as a child. Counsel stressed that Dr. Yanofsky determined Lopez had "youthful offender characteristics" under section 3051 at the time he killed Quirino.

29

The mitigation statement asked the court to exercise its discretion under section 1170 subdivision (b)(6) to impose the low terms on all charges except the murder charge. Counsel cited two factors contained in section 1170 subdivision (b)(6): "the person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence" and "the person is a youth or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense." Defense counsel also argued section 1170 supported striking the strike prior.

At the sentencing hearing, the prosecutor asked the court to sentence Lopez to "the max[imum] punishment." She asserted Lopez had shown a pattern of violent behavior, which continued after he was taken into custody. The prosecutor also argued Lopez's past behavior showed he posed an unreasonable risk to the public. Lopez's counsel, in turn, asked the court to impose the lowest possible term, to strike Lopez's prior strike, to stay punishment on the separate case involving the assault on Lopez's father (case no. SDC281300), and to impose the determinate term concurrently to the indeterminate term. She explained that Lopez had "officially renounced" his gang membership and expressed remorse for his crimes. Defense counsel also asserted that Lopez's childhood trauma, which included physical and sexual abuse, caused him to "go down the wrong path."

Lopez also addressed the court. He said he was "sorry for what [he] did," that he was "under the influence of alcohol and ... was in a gang and just that [he] was going to protect [him]self." He also said he "was drunk that day."

The court sentenced Lopez first on case no. SDC281300, which involved Lopez's assault on his father in 2019. The court stated it read Dr. Yanofsky's

report and while the abuse was not an excuse for his violence, it helped explain the assault. The court found "the mitigants are predominantly overwhelming, as were the aggravants, but based upon the fact that as a child, you were a victim of sexual abuse, you also had diagnoses that appeared to be documented beyond the self-reporting of PTSD, potential anti-social qualities, schizoaffective, and all of these things, the court is going to find the lower term and sentence you to the department of corrections for two years," which would be concurrent to the sentences in the underlying case.

The court then sentenced Lopez in the instant case. For count 1, second degree murder, the court imposed an indeterminate term of 15 years to life plus one year for the personal use of a deadly weapon enhancement (§ 12022, subd. (b)(1)). With regard to counts 2, 3 and 4, the court deemed count 4 (assault with a deadly weapon) as the primary count. The court then found "the mitigants and the aggravants basically are the same" and sentenced Lopez to the midterm of three years. The court declined to strike the prior strike, explaining it was not in the interest of justice to do so, doubling the three-year term to six. The court imposed the midterm of two years on count 3 (manufacturing a weapon), doubled to four years because of the strike, but stayed the term pursuant to section 654. On count 2 (possessing a weapon in jail), the court imposed the midterm of two years to run consecutively. The court also stated it did "not find a legal basis to strike the prior," and imposed a five-year term for the serious prior felony enhancement.[11]

---

[11] The court also imposed concurrent 16-month sentences in a separate case on convictions for grand theft and burglary. The total determinate term of 15 years and 8 months includes these two 16-month sentences, the six-year term imposed on count 4, the two-year term imposed on count 2, and the five-year prior felony enhancement.

B

*Imposition of The Middle Term on Count 4*

"Section 1170, subdivision (b) governs imposition of a judgment of imprisonment when a statute specifies three possible terms." (*People v. Suazo* (2023) 95 Cal.App.5th 681, 704.)  Senate Bill No. 567 and Assembly Bill No. 124, effective January 1, 2022, amended section 1170 subdivision (b), "in several fundamental ways." (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1038.)  Under the amended law, the statute "creates a presumption that the sentencing court 'shall' enter a lower term sentence, when, among other things, a 'psychological, physical, or childhood trauma' contributed to the offense.' " (*People v. Salazar* (2023) 15 Cal.5th 416, 419 (*Salazar*), quoting § 1170, subd. (b)(6) & (b)(6)(A).)  Likewise, the low term is the presumptive term if the defendant "is a youth, or was a youth as defined under subdivision (b) of section 1016.7 at the time of the commission of the offense."[12]  (§ 1170, subd. (b)(6)(B).)  The sentencing court "may only depart from this lower term presumption if it finds that the aggravating circumstances outweigh the mitigating circumstances such that the lower term would be contrary to 'the interests of justice.' " (*Salazar,* at p. 419, quoting § 1170, subd. (b)(6).)

"Discretionary sentencing decisions, such as whether 'the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice' (§ 1170, subd. (b)(6)) are reviewed for an abuse of discretion." (*Salazar, supra*, 15 Cal.5th at p. 428, fn. 8; *People v. Hilburn* (2023) 93 Cal.App.5th 189, 205 (*Hilburn*).)  The party attacking the sentence has the burden to " ' " 'clearly

_____

[12]    Section 1016.7, subdivision (b) defines "youth" as "any person under 26 years of age on the date the offense was committed."  At the time Lopez committed the crime charged in Count 4 he was 29 years old.

show that the sentencing decision was irrational or arbitrary.' " ' " (*People v. Fredrickson* (2023) 90 Cal.App.5th 984, 988.)

Lopez contends the court abused its discretion by not imposing the low term on count 4 because of the existence of several mitigating factors: his age at the time of the homicide (he was 23), significant childhood trauma and prior victimization, diagnosis of attention deficit hyperactivity disorder, substance abuse, and his separation from his gang and recent attempts to address his mental health and substance abuse issues. The Attorney General responds that Lopez forfeited this issue by not raising it in the trial court. Further, the Attorney General asserts that the trial court appropriately exercised its discretion in determining that imposition of the low term was contrary to the interests of justice because the aggravating circumstances outweighed those in mitigation.

We agree with the Attorney General that Lopez has not shown the court abused its discretion by imposing the middle term. The court considered Dr. Yanofsky's report, evidenced by its imposition of the lower term for the probation conviction stemming from Lopez's assault on his father, which the court found was related, at least in part, to the abuse Lopez suffered as a child. The court then found that with respect to the crimes at issue in the present case, the mitigating and aggravating factors were about the same, and, implicitly, that Count 4 was not related to the abuse suffered by Lopez and imposition of the middle term was in the interest of justice. These findings were amply supported by the record before the court. Lopez's bald assertion on appeal that the mitigating factors clearly outweighed those in aggravation does not show the court abused its discretion by sentencing Lopez to the middle term of three years on count 4. (See *Hilburn, supra*, 93 Cal.App.5th at p. 205 ["After a sufficient factual basis to support the

33

circumstances in aggravation or mitigation is found, the court enjoys broad discretion in its sentencing determination."].)

C

*Prior Strike*

Section 1385 subdivision (a), permits a trial court to "strike factual allegations relevant to sentencing, such as the allegation that a defendant has prior felony convictions." (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 504.)  However, " 'the Three Strikes law does not offer a discretionary sentencing choice, as do other sentencing laws, but establishes a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike, unless the sentencing court "conclud[es] that an exception to the scheme should be made because, for articulable reasons which can withstand scrutiny for abuse, this defendant should be treated as though he actually fell outside the Three Strikes scheme." ' " (*People v. Carmony* (2004) 33 Cal.4th 367, 377 (*Carmony*).)  "[T]he [T]hree [S]trikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so." (*Id.* at p. 378.)

In exercising its discretion, the sentencing court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)  "[A] trial court does not abuse its discretion unless its decision is so irrational or

34

arbitrary that no reasonable person could agree with it." (*Carmony, supra,* 33 Cal.4th at p. 377.)

Lopez argues the court abused its discretion by denying his request to strike his prior strike because of his age at the time of the crimes and because of the trauma, mental illness, and abuse he experienced as a child. The Attorney General responds that the nature of the crimes in this case and Lopez's significant criminal history establish this is not the rare case that falls outside the spirit of the Three Strikes Law.

We agree with the Attorney General that the record shows the trial court properly considered the relevant information and factors in denying Lopez's request to strike his prior strike, and that the denial was not an abuse of discretion. As the People point out, Lopez's violent criminal history began in 2009 when he assaulted two other youths inside a juvenile detention facility. In 2016, Lopez committed the violent murder of Quirino, then in 2019 assaulted his father and committed grand theft and burglary. Finally, after he was in custody, Lopez committed another assault with a deadly weapon. These facts demonstrate a pattern of violent behavior, placing him squarely within the spirit of the Three Strikes law. (See *Carmony, supra,* 33 Cal.4th at p. 378 ["Because the circumstances must be 'extraordinary ... by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary."].)

## D

### *Serious Prior Felony Enhancement*

With respect to the serious prior felony conviction enhancement, section 1385 subdivision (c)(1) provides that the sentencing "court 'shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.' Under subdivision (c)(2), in exercising its discretion, 'the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety.' (§ 1385, subd. (c)(2).)" (*People v. Gonzalez* (2024) 103 Cal.App.5th 215, 221.) The statute "provides that ' "[e]ndanger public safety" means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.' " (*Ibid.*)

The mitigating circumstances set forth in section 1385 subdivision (c)(2) are: "(A) Application of the enhancement would result in a discriminatory racial impact …. [¶] (B) Multiple enhancements are alleged in a single case. In this instance, all enhancements beyond a single enhancement shall be dismissed. [¶] (C) The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed. [¶] (D) The current offense is connected to mental illness. [¶] (E) The current offense is connected to prior victimization or childhood trauma. [¶] (F) The current offense is not a violent felony as defined in subdivision (c) of Section 667.5. [¶] (G) The defendant was a juvenile when they committed the current offense or any prior offenses, including criminal

36

convictions and juvenile adjudications, that trigger the enhancement or enhancements applied in the current case.  [¶] (H) The enhancement is based on a prior conviction that is over five years old.  [¶] (I) Though a firearm was used in the current offense, it was inoperable or unloaded." (Pen. Code, § 1385, subd. (c)(2).)

Under this statute, "absent a finding that dismissal would endanger public safety, a court retains the discretion to impose or dismiss enhancements provided that it assigns significant value to the enumerated mitigating circumstances when they are present.  [Citation.]  In other words, if the court does not find that dismissal would endanger public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' " (*People v. Walker* (2024) 16 Cal.5th 1024, 1029.)

Lopez argues that the court erred by failing to dismiss the serious prior felony enhancement in accordance with section 1385 subdivision (c)(2) because multiple enhancements were alleged (the serious prior felony enhancement he now challenges, and the deadly weapon enhancement attached to count 1) and imposition of the 5-year enhancement term resulted in a sentence greater than 20 years.  Lopez also contends two additional mitigating factors supported dismissal: the current offenses were connected to his mental illness and to his prior victimization and childhood trauma. The Attorney General responds that Lopez forfeited this challenge by failing to raise it in the trial court.

We agree with the Attorney General that Lopez forfeited the issue. (See *People v. Stowell* (2003) 31 Cal.4th 1107, 1114 (*Stowell*) ["The forfeiture doctrine is a 'well-established procedural principle that, with certain exceptions, an appellate court will not consider claims of error that could have been—but were not—raised in the trial court. [Citation.]' [Citations.] Strong policy reasons support this rule: 'It is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.' "].) Although Lopez's statement in mitigation asked the court to impose the lowest possible sentence and to strike his serious prior felony conviction, the statement did not mention section 1385. Likewise, at the sentencing hearing, defense counsel asked the court to strike the strike prior, but did not ask the court to strike the serious prior felony enhancement.

Even if we were to reach the issue, we would conclude it lacks merit. Lopez provides no argument suggesting the trial court was unaware of or misunderstood the scope of its sentencing discretion. We assume the trial court was aware of and followed applicable law. (*Stowell, supra,* 31 Cal.4th at p. 1114 [" 'a trial court is presumed to have been aware of and followed the applicable law' "].) Accordingly, Lopez's "citation to a silent record is insufficient to meet his burden to demonstrate an abuse of discretion" by failing to strike the serious prior felony enhancement. (*People v. Coleman* (2024) 98 Cal.App.5th 709, 725.)

## DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

BUCHANAN, J.

CASTILLO, J.